UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ANDRE LEROY JAMISON,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF OAKLAND, DANIEL MAIN, and JASON TEELANDER,<br><br>    Defendants. | Case No. 15-13748<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [27]**

Oakland County Sherriff's Deputy Daniel Main stopped a car driven by Andre Leroy Jamison on suspicion that he had just fled a drug transaction. Deputy Jason Teelander arrived as backup. The traffic stop ended with Jamison on the ground and handcuffed by the two officers after they struck him multiple times. Jamison claims that Main and Teelander punched him inside of his vehicle and punched and kicked him after he had been removed even though he never resisted. But the officers contend that Jamison resisted them during the stop and that their use of force was therefore reasonable. Jamison sued, asserting claims of excessive force under 42 U.S.C. § 1983 against Main and Teelander, a *Monell* claim against Oakland County, and various state-law claims. Defendants moved for judgment on the pleadings on the *Monell* claim and summary judgment on the remaining claims. (R. 27.) For the reasons that follow, the Court will grant the motion in part and deny it in part.

I.

A.

On November 8, 2011, Plaintiff Andre Leroy Jamison drove to a parking lot on Woodward Avenue in Pontiac, Michigan—he claims to meet a friend who owed him money. (R. 33-1, PID 236–37 ¶¶ 1–4.) Defendant Daniel Main, an Oakland County Sheriff's Deputy who was in the area surveilling a residence for suspected drug activity, spotted Jamison when an unidentified individual emerged from that residence and handed Jamison a fold of money through the window of Jamison's car. (R. 27-1, PID 168–69 ¶¶ 6–8.)

Main claims that Jamison then sped away, nearly striking two vehicles in the process. (R. 27-1, PID 169 ¶¶ 9–10.) Main pursued him and radioed for assistance, intending to investigate the suspected drug transaction and to arrest Jamison for reckless driving. (R. 27-1, PID 169–70 ¶¶ 10, 11, 13.) Jamison disputes that he sped or came close to striking any vehicles as he drove away. (R. 33-1, PID 237 ¶¶ 3, 5.)

Jamison observed Main's unmarked police vehicle behind him flashing its lights, so he pulled over. (R. 33-1, PID 237 ¶ 6.) Main approached Jamison's driver's-side door and requested Jamison's license, registration and insurance, and Jamison complied. (R. 27-1, PID 169 ¶ 12.) Main then asked Jamison to step out of his car. (R. 27-1, PID 170 ¶ 13; R. 33-1, PID 237 ¶ 10.) Main says that Jamison refused and "claim[ed] he didn't need to since he had provided me with the requested documentation." (R. 27-1, PID 170 ¶ 14.) Jamison counters that he did not refuse but rather asked Main why he was being ordered to exit the car. (R. 33-1, PID 237 ¶ 12.)

Another Oakland County Sheriff's deputy, Defendant Jason Teelander, then arrived on the scene, and the stop soon became physical. (R. 27-1, PID 170 ¶ 15; R. 33-1, PID 237 ¶ 13.) The officers report that Main again asked Jamison to exit the car but that Jamison "refused" to

2

comply. (R. 27-1, PID 170 ¶ 16; R. 27-2, PID 176 ¶ 9.) Main avers that he thus began to fear for his safety given the uncertainty as to whether or not Jamison had a weapon, so he reached into Jamison's car and grabbed Jamison's left wrist. (R. 27-1, PID 170 ¶ 17.) Main claims that Jamison tried to break free, but that he successfully handcuffed Jamison's left wrist. (R. 27-1, PID 170 ¶¶ 18–19.) Main further claims that Jamison responded by grabbing Main's shirt and the ballistic vest underneath. (R. 27-1, PID 170 ¶¶ 18–19.) Teelander intervened, and Main and Teelander admit that together they delivered several "closed-fist strikes" to Jamison. (R. 27-1, PID 171 ¶ 20; R. 27-2, PID 176 ¶ 12.) Main says the strikes allowed him to handcuff Jamison's right wrist and to begin to pull him from the car. (R. 27-1, PID 171 ¶ 21–22.)

Jamison tells a different story about the altercation in the car. When Teelander arrived, Jamison claims that both officers began "shouting" in a hostile manner, ordering Jamison to get out of the car. (R. 33-1, PID 238 ¶ 15.) Jamison claims he felt afraid, and when both officers reached into his car, he says he "instinctively" pulled back, fearing for his safety. (R. 33-1, PID 238 ¶ 16.) Jamison's story intersects with the officers' in that he says they threw "fists, punches, and jabs" at him through the window of the car. (R. 33-1, PID 238 ¶ 17.)

A cell phone video taken by a bystander captures the incident beginning with the struggle inside the car and ending with the officers securing Jamison on the ground. The video shows Main and Teelander struggling with Jamison inside the car for approximately forty seconds, but the officers' bodies obscure most of the details. (*See* R. 30.)

Once the officers pulled Jamison out of the car, they continued to use force, but the parties dispute how the remainder of the altercation played out. Main claims that due to Jamison's continuing resistance, he used a single "leg sweep" to destabilize Jamison's legs. (R. 27-1, PID 171 ¶ 22.) Teelander corroborates this account, and both officers admit that Teelander

3

simultaneously delivered a single "knee strike" to Jamison's leg to get him on the ground to subdue him. (R. 27-2, PID 177 ¶ 13; R. 27-1, PID 171 ¶ 22.) Both officers assert that they did not administer any other force aside from the strikes inside the car and the two leg strikes to force Jamison to the ground. (R. 27-1, PID 171 ¶ 25; R. 27-2, PID 177 ¶ 17.)

Jamison's account differs. He claims that he never physically resisted at any point during the conflict. (R. 33-1, PID 238 ¶18.) Despite his lack of resistance, Jamison claims, the officers "dragged me out of the car while striking me, they kicked me, and inflicted multiple impact assaults as I lay on the ground motionless[.]" (R. 33-1, PID 238 ¶18.)

The video of the incident shows the two leg strikes delivered by Main and Teelander once Jamison is out of the car. (R. 30.) The video does not show any other strikes, including the alleged "multiple impact assaults" while Jamison was on the ground. But the video also does not reflect any obvious signs of Jamison's purported resistance. The video cuts off once Main and Teelander secured Jamison on the ground.

After securing Jamison, the officers found $420 cash in his pocket, "a large quantity of 3 and 4 digit daily lottery slips, and tally/betting sheets which listed numbers tha[t] had been bet and corresponding dollar amounts." (R. 27-1, PID 172 ¶ 28.) They arrested Jamison for reckless driving and obstructing a police officer. (R. 27-1, PID 172 ¶ 29.) The charges were later dismissed. (R. 27-1, PID 173 ¶ 31.)

Jamison says his body ached for days after the incident. (R. 33-1, PID 238 ¶ 21.) Curtis Childs, a supervisor at the Oakland County Jail where Jamison was detained after the incident, avers that Jamison's booking photo reflects "no visible signs of injury to Mr. Jamison's head, face or neck area." (R. 27-4, PID 183 ¶ 7, 188.) Jamison was also medically screened upon detainment. (R. 27-4, PID 184, ¶ 8.) In the screening questionnaire, the clerk on duty noted

nothing unusual about Jamison's appearance, including skin marks or bruises. (R. 27-4, PID 185 ¶ 18–19.) The clerk also noted that Jamison did not appear to be in any pain and did not require any emergency services or medical care. (R. 27-4, PID 186 ¶¶ 20–21.) In addition, according to Childs, nothing in the booking file suggests Jamison exhibited or complained of injury upon arriving at the jail. (R. 27-4, PID 186 ¶ 23.)

B.

Jamison filed a complaint in this Court in October 2015. (R. 1.) His complaint asserts six counts: an excessive force claim under 42 U.S.C. § 1983 against Teelander and Main,[1] a *Monell* claim against Oakland County, and state-law claims of assault and battery, false arrest and false imprisonment, gross negligence, and intentional infliction of emotional distress. In December 2016, after discovery closed, Defendants moved for judgment on the pleadings as to the *Monell* claim and summary judgment on all other claims, and the motion is fully briefed. (R. 27, 33, 35.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2).

II.

As Defendants filed their motion pursuant to Federal Rules of Civil Procedure 12(c) and 56, the governing standards are two-fold.

---

[1] Count I is labelled as "42 USC §1983 [sic] Deprivation, Individual Police Officers." (R. 1, PID 5.) The Count does not contain the exact words "excessive force" or even "Fourth Amendment," so Defendants urge that the claim is too "vague" or "ambiguous" to be cognizable. (R. 27, PID 152–54.) But given the complaint's allegations—for example, that "[o]nce down both officers began to beat [Jamison] with their fists and kick him with their booted feet" despite his lack of resistance (*see* R. 1, PID 4 ¶¶ 19–20)—it is hardly a stretch for the Court to construe the sole count against the individual defendants under Section 1983 as a claim that alleges excessive force in violation of the Fourth Amendment.

5

Motions pursuant to Rules 12(b)(6) and 12(c) are governed by the same standards. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 898 (6th Cir. 2014). The Court accepts as true the non-conclusory allegations in the complaint and then asks whether those permit "the reasonable inference" that Defendants are "liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although this plausibility threshold is more than "sheer possibility that a defendant . . . acted unlawfully," it is not a "'probability requirement.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" its claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Id.* at 679–80 (quoting *Twombly*, 550 U.S. at 570).

As for the summary-judgment side of Defendants' motion, under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff."). On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here Jamison. *See Matsushita*, 475 U.S. at 587.

### III.

### A.

The Court begins with Defendants' motion for summary judgment on Jamison's excessive force claim. The officers do not assert a qualified immunity defense. Instead, they urge that as a matter of law their conduct was reasonable and did not amount to excessive force.

"The Fourth Amendment prohibits the use of excessive force during the seizure of a free citizen." *See Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997). When analyzing excessive force claims, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The "proper application" of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

As to the first *Graham* factor, Main had reason to believe that Jamison was involved in a drug transaction, a serious crime. Main pulled Jamison over not only for reckless driving but also on suspicion of fleeing a drug deal. (R. 27-1, PID 170 ¶ 13.) Although Jamison was later found to have no drugs on his person, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Main witnessed an individual walk out of a residence he

was surveilling because of suspected drug activity. (R. 27-1, PID 168–69 ¶¶ 6–7.) And he witnessed this individual hand Jamison a fold of money through the window of Jamison's car. (R. 27-1, PID 169 ¶ 8.) A reasonable officer in Main's position would have had reason to believe that Jamison was involved in an illegal drug transaction. As other courts have recognized under the *Graham* analysis, drug possession and possible distribution are serious crimes. *See*, *e.g.*, *Smith v. Wampler*, 108 F. App'x 560, 565 (10th Cir. 2004).

But that does not mean Jamison's alleged reckless driving provides further justification for the officers' force. Jamison's affidavit disputes Main's allegation that he sped away from the transaction recklessly and almost hit two other vehicles. (R. 33-1, PID 237 ¶¶ 3, 5; R. 27-1, PID 169 ¶¶ 9–10.) And the Court must accept Jamison's account as true for summary-judgment purposes. Still, as the suspected drug transaction alone was a serious crime, even viewing the facts in the light most favorable to Jamison, the first *Graham* factor weighs in Defendants' favor.

Turning to the second factor, Jamison may have posed a potential threat to Officers Main and Teelander at the beginning of the traffic stop while he was inside the car, but this threat diminished throughout the encounter as the officers handcuffed him and removed him from the car. *See Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (noting that to determine the reasonableness of officers' force, courts analyze altercations in "segments").

When Jamison was still inside the car and declined to exit after being asked to do so, the officers had an objectively reasonable basis to fear for their safety. The Court acknowledges that, generally, traffic stops pose a significant safety threat to police officers. *See Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (observing that "traffic stops are especially fraught with danger to police officers" and that "[t]he risk of harm to both the police and the occupants [of a stopped

8

vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation" (internal quotation marks and citations omitted, alteration in original)). Defendants lean heavily on *United States v. Holt*, 264 F.3d 1215, 1222–23 (10th Cir. 2001) (en banc) (per curiam), *abrogated on other grounds as recognized in United States v. Stewart*, 473 F.3d 1265 (10th Cir. 2007), to support their contention that the force here was reasonable due to the general danger posed to officers during traffic stops. The *Holt* court observed that because "officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle," among other things, "[a]n officer may order the driver out of a vehicle in the interest of officer safety during a traffic stop, even in the absence of any particularized suspicion of personal danger." *Id.* But *Holt* does not stand for the proposition that officers can reach into a suspect's car and begin to punch him when he does not immediately comply with their request to exit the vehicle. And that is what Jamison alleges happened here. (R. 33-1, PID 170 ¶¶ 14–17.)

Moreover, some evidence suggests that the threat Jamison posed diminished once he was removed from the car. The officers admit that they cuffed one of Jamison's hands before punching him inside of the car and that those punches enabled them to cuff his other hand. (R. 27-1, PID 171 ¶¶ 19, 21.) Once removed from the car, Jamison was handcuffed and physically surrounded by the officers. His threat was therefore arguably much less than it was while he was unsecured inside of his car. Yet the video is consistent with the conclusion that after removing Jamison from the car, the two officers each kicked him while he was handcuffed and just standing still. (*See* R. 30.) Thus, overall, this factor weighs in Jamison's favor.

Finally, the third *Graham* factor also weighs in Jamison's favor. Both Jamison and Main confirm that while Jamison was inside the car, he complied with Main's initial request to hand over his materials. (R. 27-1, PID 169 ¶ 12; R. 33-1, PID 237 ¶ 9.) While Jamison admits that he

9

questioned Main and did not immediately get out of the car once asked, "noncompliance alone does not indicate active resistance; there must be something more." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). Furthermore, while Jamison explains that he "instinctively" pulled back out of fear when Main reached into his car, that is the sole evidence of any form of resistance when it comes to his version of events. (R. 33-1, PID 238 ¶ 16.) Nonetheless, both Jamison and the officers' stories confirm that Main and Teelander proceeded to punch Jamison while he was still seated inside of the car. (R. 27-1, PID 171 ¶ 20; R. 27-2, PID 176 ¶ 12; R. 33-1, PID 238 ¶ 17.)

Once Jamison was removed from the car, taking the facts in the light most favorable to him, he did not resist. Jamison claims he was "dragged" out of the car and that he did not resist at any point. (R. 33-1, PID 238 ¶ 18.) The video evidence also shows no obvious signs of resistance from Jamison. Despite this, it appears from the video that Main and Teelander struck him twice while he was handcuffed and at a time when he was just standing still. (R. 27-1, PID 171 ¶ 22; R. 30.) Therefore, the third *Graham* factor also weighs in Jamison's favor.

Granted, "evidence related to the severity of a plaintiff's injuries may be relevant in determining the amount of force used." *Turner v. Viviano*, No. 04-CV-70509-DT, 2005 WL 1678895, at *7 (E.D. Mich. July 15, 2005) (citing *Martin v. Heideman*, 106 F.3d 1308, 1311–12 (6th Cir. 1997)). And here, little evidence suggests that Jamison suffered any injuries as a result of the officers' force. But as Defendants concede, the lack of severity of Jamison's injuries is not dispositive. (R. 27, PID 161.)

In sum, taking the facts in the light most favorable to Jamison, after witnessing a suspected drug transaction, Main and Teelander punched Jamison repeatedly inside his car after he asked why he was being ordered out and kicked him while he was handcuffed and non-

resistant outside of the car. The *Graham* factors support the conclusion that such force was objectively unreasonable. So Defendants are not entitled to summary judgment.

**B.**

The Court now considers Defendants' motion for judgment on the pleadings on Jamison's *Monell* claim against Oakland County. Jamison claims that "[t]he County's liability is based upon the fact that it knew or should have known, while screening Teelander and Main and before hiring them on July 31, 2011, that both Defendants had committed the same excessive and assaultive acts during prior arrests as Pontiac Police Officers." (R. 33, PID 216.)

By way of background, prior to working for Oakland County, Main and Teelander were employed by the City of Pontiac as police officers. (R. 27-1, PID 168; R. 27-2, PID 175.) Oakland County hired them on July 31, 2011 when the county took over the city's law enforcement functions. (R. 27-1, PID 168; R. 27-2, PID 175.)

Aside from asserting a host of legal conclusions, Jamison's complaint makes only one factual allegation about Oakland County's alleged failures, and it concerns the County's relationship with Main and Teelander: "The officers have a history of assaulting citizens, particularly African American citizens of Pontiac and Oakland County and the Sherriff's Department . . . knew or should have known about the history of assaults engaged in by these Defendants, yet did not seek any efforts to correct the behavior and in fact hired said Defendant(s) knowing that they had committed violent and aggressive acts against citizens with impunity." (R. 1, PID 4–5.) To support that allegation, Jamison's response brief points to a series

11

of lawsuits filed in this District against Main and Teelander, which the Court will describe in further detail below.[2] (R. 33, PID 217.)

Municipal liability under Section 1983 "will attach only where the plaintiff establishes that the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). While *Monell* claims can be based on municipal hiring decisions, a plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410. "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* at 411. "The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." *Id.* at 412.

This connection is lacking in Jamison's case. True, Teelander has been twice sued on allegations that he and other officers used excessive force during an arrest. *McGuthrie v. City of Pontiac et al*, No. 05-40097 (E.D. Mich. Mar. 24, 2005); *Guizar v. City of Pontiac et al*, No. 13-10235 (E.D. Mich. Jan. 18, 2013). But both cases ended in stipulated dismissals. And one of the

---

[2] In ruling on a motion for judgment on the pleadings, the Court may consider "matters of public record." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (citation omitted).

cases, *Guizar*, was not even filed until after Oakland County hired Teelander and after the incident with Jamison.

Jamison also points to nine prior lawsuits against Main. But as far as the Court can glean from the relevant complaints, only two of the cases had any specific allegations that Main personally used excessive force. *See Bomar v. City of Pontiac et al*, No. 08-12629 (E.D. Mich. Jun. 19, 2008); *see also Gill v. Locricchio et al*, No. 04-70164 (E.D. Mich. Jan. 16, 2004). The former was dismissed via the parties' stipulation, and the latter was dismissed due to the plaintiff's failure to prosecute. The other seven cases similarly reached no merits determination that Main was liable, and none of the cases involved allegations directly implicating Main in any excessive force. *See Tolbert et al v. City of Pontiac et al*, No. 03-71584 (E.D. Mich. Apr. 23, 2003) (alleging Main and other officers negligently responded to a shooting victim; dismissed on summary judgment); *Johnson v. Locricchio et al*, No. 03-73742 (E.D. Mich. Sep. 26, 2003) (alleging Main and other officers searched a car and arrested plaintiffs without probable cause; stipulated dismissal); *McFerrin v. City of Pontiac et al*, No. 04-75043 (E.D. Mich. Dec. 28, 2004) (alleging officers illegally forced stomach pumping after a traffic stop, but making no specific allegation against Main; stipulated dismissal); *Ealy v. City of Pontiac et al*, No. 05-72150 (E.D. Mich. Jun. 1, 2005) (alleging numerous officers used excessive force during a narcotics search, but making no specific allegation against Main; dismissed on summary judgment); *Alexander v. City of Pontiac et al*, No. 07-11419 (E.D. Mich. Apr. 2, 2007) (alleging officers used excessive force during an arrest, but making no specific allegation about Main; dismissed for failure to prosecute); *McCumons v. Marougi et al*, No. 08-11164 (E.D. Mich. Mar. 18, 2008) (alleging Main was source of a city policy authorizing false arrests but did not participate in the arrest in the case; stipulated dismissal); *Dent et al v. Janczarek et al*, No. 10-

13793 (E.D. Mich. Sep. 23, 2010) (alleging Main made a false affidavit to obtain a search warrant; stipulated dismissal).

These prior lawsuits, without more, do not plausibly suggest that excessive force was a "plainly obvious consequence" of Oakland County's decision to hire the officers. *See Brown*, 520 U.S. at 411.

For one, Jamison has pointed to nothing substantiating any of the complaints' allegations. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (holding on summary judgment that without "evidence of prior complaints sufficient to demonstrate that . . . municipalities and their officials ignored police misconduct . . . the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force"); *see Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 799–800 (8th Cir. 1998) (holding on summary judgment that for prior complaints to establish municipal liability, "[t]here must . . . be some showing that the complaints had merit."). While the Court must take Jamison's factual allegations as true when considering Defendants' Rule 12(c) motion, the Court is aware of no authority holding that it must also take as true allegations made in entirely separate cases. Nor does the Court find it plausible that Jamison's counsel—consistent with his obligations under Federal Rule of Civil Procedure 11—could incorporate by reference into Jamison's complaint the allegations made in 11 other cases dating back over a decade.

What is more, many of the prior lawsuits resulted in stipulated dismissals, presumably after the parties reached a settlement agreement. In official capacity suits against officers, the decision to settle may be entirely out of the officer's hands. And "[t]he considerations leading to a settlement are many and varied; at times they have little to do with the basic facts of a case." *Kinan v. City of Brockton*, 876 F.2d 1029, 1034 (1st Cir. 1989) (holding that evidence of officer-

14

defendant's prior lawsuits was irrelevant to establish *Monell* liability where it appeared that both cases settled before a verdict). Indeed, the settlements could have been "motivated by a 'desire for peace'" and "not any concession of responsibility." *Choice v. Coleman*, No. 08-11762-BC, 2009 WL 4113936, at *2 (E.D. Mich. Nov. 23, 2009) (holding that officer-defendant's prior settlement was inadmissible in excessive force case under Federal Rule of Evidence 408). These un-adjudicated allegations of excessive force do not support a claim of municipal liability against Oakland County. Indeed, if they did, nearly every city and county in the country could be held liable for hiring and keeping officers with these types of complaints on their record, regardless of any finding of actual liability. Such a rule would undoubtedly discourage future settlements.

In sum, the prior lawsuits against Main and Teelander cannot be said to have put Oakland County on notice that it was plainly obvious that Main and Teelander would use excessive force. Jamison has therefore not plausibly alleged that Oakland County's hiring of Main and Teelander rose to the level of "deliberate indifference." *See Brown*, 520 U.S. at 411. Accordingly, Oakland County is entitled to judgment on the pleadings as to Jamison's *Monell* claim.

## C.

Remaining are Jamison's various state-law claims. The thrust of Defendants' summary-judgment motion as to those claims is that if the Court were to dismiss Jamison's Section 1983 claims, the Court should decline to exercise supplemental jurisdiction over the state-law claims. (*See* R. 27, PID 161–62.) As Jamison's Section 1983 excessive force claim will survive summary judgment, that argument is unavailing. Still, Defendants also offer other limited arguments on why some of the remaining state-law claims fail as a matter of law, which the Court will address.

**1.**

First are Jamison's assault, battery, and false arrest claims. Defendants make no argument that Jamison lacks evidence sufficient to meet the elements of any of these claims. Defendants instead argue that under Michigan law, governmental immunity shields them from the claims. (R. 27, PID 162.)

Under Michigan law, governmental immunity extends beyond objectively reasonable decisions and protects officers from the consequences of their *subjectively* reasonable decisions as well. *Brown v. Lewis,* 779 F.3d 401, 420 (6th Cir. 2015). An officer sued for an intentional tort is entitled to governmental immunity if he shows:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008).

Michigan places the burden of proving the affirmative defense of governmental immunity on the officers. *Id.* at 227–28. So on summary judgment, instead of having the burden of pointing out that Jamison lacks evidence upon which a jury could find for him, Defendants have the burden of producing evidence "so powerful that no reasonable jury would be free to disbelieve it." *Coney v. City of Warren*, No. 14-10842, 2015 WL 4394226, at *18 (E.D. Mich. July 16, 2015) (quoting *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)).

Defendants have not met this burden. Their only argument is this: "there is absolutely no evidence to suggest they '*utilized wanton or malicious conduct or demonstrated a reckless indifference to the common dictates of humanity.*'" (R. 27, PID 163 (emphasis in original)).

Governmental immunity does not protect "a defendant who acts with malicious intent." *Odom*, 760 N.W.2d at 228. Such intent "is defined as 'conduct or a failure to act that was intended to harm the plaintiff . . . [or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result.'" *Brown*, 779 F.3d at 420 (quoting *Odom*, 760 N.W.2d at 225). As discussed above, taking the evidence in the light most favorable to Jamison, the officers punched him while he was inside the car simply because he asked why he needed to exit, and once he was outside, they each kicked him even though he was handcuffed and not resisting. On those facts, a reasonable jury could find that the officers' force in arresting Jamison reflected indifference as to whether harm would result to Jamison such that they effectively intended to harm him, and therefore acted without good faith. *See Odom,* 760 N.W.2d at 225.[3]

Therefore, Jamison has raised a genuine issue of material fact as to whether the officers are entitled to governmental immunity, making summary-judgment unwarranted.

**2.**

Jamison's final claim is one of gross negligence. Defendants argue that Jamison's claim fails as a matter of law because his claim is based on the same acts that constitute his excessive force, assault and battery, and false arrest claims. (R. 27, PID 164.) The Court agrees.

It is well-established Michigan law that intentional tort claims cannot be converted into ones for gross negligence. *See VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004) ("[P]laintiff's claim of gross negligence is fully premised on her claim of excessive force . . . this Court has rejected attempts to transform claims involving elements of intentional

---

[3] When it comes to the false arrest claim as opposed to the assault and battery claim, the Court notes that Defendants have made no argument specific to that claim. So the Court is hard pressed to grant summary judgment in their favor. Furthermore, it is not even apparent from Defendants' brief that they seek governmental immunity for Jamison's other intentional tort claim, intentional infliction of emotional distress.

17

torts into claims of gross negligence." (citations omitted), *overruled in part on other grounds as recognized by Brown*, 779 F.3d at 420.

Jamison's gross negligence claim is explicitly based on the same physical acts as his intentional tort and excessive force claims. (R. 1, PID 12.) As Jamison points out, it is true that Federal Rule of Civil Procedure 8(d)(2) allows for alternative pleading. But neither his pleadings nor his affidavit—which state that the officers punched and kicked him while he was not resisting—leave any room for the alternative that the officers' alleged conduct was anything but intentional. Moreover, while Jamison urges that *VanVorous* was incorrectly decided, he points to nothing suggesting that courts have deviated from their usual course of dismissing gross negligence claims based on allegations of intentional torts under Michigan law. *See*, *e.g.*, *Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 344 (6th Cir. 2016); *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011); *Johnson ex rel. Steward v. Driggett*, No. 306560, 2013 WL 375701, at *7 (Mich. Ct. App. Jan. 31, 2013) (per curiam).

Therefore the Court will grant summary judgment to Defendants on Jamison's gross negligence claim.

## IV.

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings and/or Summary Judgment (R. 27) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that Count II against Oakland County and Count V asserting gross negligence are DISMISSED. It follows that Oakland County is DISMISSED as a defendant. The

motion is DENIED in all other respects.

    SO ORDERED.

Dated: July 10, 2017

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

    The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 10, 2017.

s/Keisha Jackson
Case Manager